Mr. Justice Hagner
delivered the opinion of the Court:
This is an action at law brought by the plaintiff to recover the sum'of $5,000 with interest from the ioth day of April, 1883, which the plaintiff claimed he “ delivered to the defendants on that date to be used and applied by them in the purchase of the property of the late Pennsylvania and Sodus Bay Railroad Company, under an agreement whereby the title to said property was to be at once conveyed to the defendants as trustees for the protection of the parties advancing the said purchase money; but the defendants did not apply the said money or any part thereof to the purchase of said property; but the said property was sold and conveyed to other party or parties; whereupon the plaintiff demanded from the defendants the return of said money, but they wholly refused and still refuse to return the same or*any part thereof.”
The circumstances out of which this transaction arose, as appearing in the record, were these: In the spring of 1883, Mr. Cooper approached Mr. Payne and requested him to become a subscriber to a scheme then on foot to purchase railroad named, with all of its appliances, located in the northern part of the State of New York. He showed Payne an agreement dated 12th of March, 1883, by which certain Dudley and Dean agreed to sell to Sears, Crowley and Clapp all the property, real and personal, lately belonging to the railroad company, which had been purchased by Merritt & King, at a sale under a judgment of the Supreme Court of the State of New York; allowing them until the 12th day of April, 1883, to examine the records and legal proceedings and to inspect the property; and if Sears, Crowley and Clapp should elect to purchase, Dudley and Dean agreed to convey to them the property on the payment of $35,000 in cash, on or before the said 12th day of April.
Another paper then shown to Payne, dated 16th of March 1883, was á transfer of the property and franchises from *245 Sears, Crowley and Clapp to Cooper and Pomeroy. It recited that in procuring the optional contract, certain expenditures were made amounting to $5,000, which were paid by Cooper and Pomeroy, and in consideration' of said advances, the grantees in said optional contract thereby sell, assign and transfer unto Cooper and Pomeroy, and the survivor of them, his heirs and assigns, all the right, title and interest which said Sears, Crowley and Clapp had acquired by virtue of said optional contract.
“ The same to be held by said Cooper and Pomeroy and .the survivor of them in trust for the repayment of the said money advanced as aforesaid, until said contract shall have been, or shall be performed, when this assignment shall merge into and be provided for as the further agreement made contemporaneous herewith, which hereby is also made. part hereof for such purpose, by which the entire assets, property, bonds and stock, of the railroad company hereafter to be organized, shall be and are pledged in a suitable way for the repayment of the aforesaid sum of money and interest thereon, together with all other moneys and interest thereon, which may hereafter be paid to secure said property as provided in the said contract first herein mentioned.”
To this agreement signed by Sears, Crowley and Clapp, Cooper and Pomeroy appended their acceptance in these words: “We accept the trust hereby created, and agree to perform the conditions thereof.”
The contemporaneous paper referred to in this agreement as a declaration of trust bears date the same day, and states that Sears, Crowley and Clapp — as the assignees and representatives of others interested in the contract of the 12th of March 1883, between Dudley and Dean themselves — with a view to the completion of the purchase and to define the interests of the parties therein, propose and agree as follows:
“That whereas the said contract has this day been assigned to Glen W. Cooper and Samuel C. Pomeroy, as trustees, to secure the repayment of $5,000 already advanced, *246 now it is further agreed, that the said contract and all the interests therein conveyed to the said trustees, shall be held by them for the benefit of any and all persons who may contribute towards the payment of the $35,000, being the balance due on the said first named contract.
“ It is further agreed that upon the. completion of the purchase of the said property by the payment of the said $35,000, a railway corporation shall be organized under the laws of the State of New York; that in the' organization of said corporation the said persons so contributing as aforesaid shall name a majority of the board of directors; that any and all stocks and bonds issued by the said corporation so organized shall be issued and delivered to the said trustees hereinbefore named, who shall hold the same in trust until the said moneys, to wit, the sum of $5,000 already advanced, and the said $35,000, and all interest thereon at the rate of six per cent, per annum, shall have been repaid to the parties respectively who have advanced the same.
“ Upon the repayment of the said sums of money aforesaid, and the interest thereon, by the sale or negotiation of said stocks and bonds, or otherwise, this assignment shall become void, and the said stocks and bonds shall belong to the parties advancing the $40,000 as aforesaid, in the proportion of four-tenths of the whole, and five-tenths' shall belong to the parties whose interest may then appear, and the remaining one-tenth shall belong to Glen W. Cooper, for moneys already advanced.
“ It is further agreed that the subscription for the raising of the $35,000 aforesaid, shall be paid to' the said trustees, who, when the whole amount shall have been paid, shall cause the same to be paid over to the present owners of the said property, and a good and sufficient title to be made to the said railway corporation hereafter to be organized as aforesaid.”
This also was signed by the grantors, and Cooper and Pomeroy signified their acceptance of its contents by signing the following:
*247 “We accept the trust hereby created and agree to perform the conditions thereof.”
Payne testified, that when these papers were shown to him, they were accompanied by representations made by Cooper and Pomeroy and by an engineer connected with the work, as to the condition of the road; and among other things he was told it was advisable the subscriptions should be in sums of $5,000, and that a number of them had been promised. After considering the matter, Payne agreed to go into the enterprise. He met the parties, or some of them, in New York, paid his $5,000 to the trustees, and was given a receipt which is in these words:
“ Received of James G. Payne, five thousand dollars, to be applied as part of the purchase money of the property of the late Pennsylvania & Sodus Bay Railroad Company; this money to be refunded to said James G. Payne out of the first money realized from the sale of bonds issited by the Pennsylvania, Lake Ontario & Northern Railroad Company, a corporation to be organized on the basis of said property purchased pursuant to the trust created for the protection of the parties advancing said purchase money in which the undersigned are trustees; said James G. IJayne to retain and receive a one-twentieth portion of all bonds and stocks issued by the corporation to be organized as aforesaid, or the proceeds thereof, and of all profits in the purchase, building, operating or sale of said railroad property.” Dated New York, April 10, 1883. Glen W. Cooper, S. C. Pomeroy, trustees.
Payne, who was the only witness examined in his own behalf, states that after making this payment he returned to Washington; it being understood Cooper was to see him here as soon as the contract was consummated. Up to that time, the only sums claimed to have been paid in were $5,000 each by Cooper, Pomeroy and Payne. Payne testified that about a month and a half after this interview Cooper came to see him and said the transaction had been completed, but he was sorry to say, with a slight change of *248 terms; that Mr. Alley, who had. put in $25,000, was to receive his $25,000 before we should be reimbursed our contributions to the fund. I stated to Mr. Cooper that that was not the agreement under which I deposited my $5,000; that the terms were changed, and he had no authority or consent from me to make any application of the $5,000, other than as indicated in the receipt which he had given me, and the written contract which I had seen. . He said that was true, but that they had not time to confer with me about it, and that he did not think it would make a great deal of difference, as the property was so valuable. . I told him that I had entered into the scheme with some hesitation, feeling that in any event some portion of the $5,000 would come back if the contributors were all upon an equal footing, when, as the matter had been consummated, they were not on an equal footing, as I was subordinated to Mr. Alley, whom I had never heard of, and I was. not willing to stand by such an agreement. Mr. Cooper then requested me to do nothing, stating: “I am responsible for getting you into this thing, and I will find some one to take your place.” We had several conversations of a similar character, and on one occasion Mr. Cooper named a party I did not know, but whom he was endeavoring to induce to take my place in the scheme and refund me my money.”
“ Later in, that summer, Mr. Cooper informed me that the railroad organization had been effected, or was about to be effected, and directors elected, and that it would be necessary for those who had contributed to the fund to put up money to pay certain expenses. I stated to him that I did not consider myself as in the scheme at all, and so felt under no obligations myself to contribute any. I think then we had some correspondence in regard to the matter, and' some personal interviews, also, in which he stated to ’ me that if I would advance the money, he would refund it to me himself; that he was not able at that time, by reason of demands upon his financial means, to do it, but that he would like to have me do it, pending the efforts that *249 he was then making to get some one to take my place in the concern. I did send a check, either gaire it to him or sent it to Mr. Jordan in New York. He was the treasurer, and his name was given by Mr. Cooper.” “ Í did not attend any meeting of the directors in New York. Mr. Rice said I attended a meeting before any of the assessments were made. I never attended a meeting of the directors in my life. My business was with Messrs. Cooper and Pomeroy. I never had notice of any meeting, and had no reason to attend any meeting, as I was not a director. Two other assessments were made and checks given by me under the same circumstances and on the same terms, that Mr. Cooper was to have an opportunity of getting some one to take my place, and that he would refund the money if I wished it.”
In a letter dated 5th of August, 1883, from Cooper to Payne, on the subject of these assessments, he writes: "If you have not already sent your $65 to the treasurer, I hope you will on receipt of this. If I had not so much demand for money, I would pay it; but I will, if you desire, insure its return to you if you should wish to dispose of your share.”
Payne also stated he insisted he had nothing further to do with the matter, but influenced by the statement of Cooper that he was making an effort to relieve him by selling whatever interest he had to somebody else and that he was not in financial condition to pay this assessment but would guarantee he would return it, he paid the first assessment and afterwards paid two others, one of $50 and another of a smaller amount, all by checks of Payne in favor of Jordan, treasurer, New York, that up to this time not a word had been said by Cooper indicating there had been any conveyance made to Alley, nor that there had been any change from the terms of the trust, except as to Alley’s preference; nor had he been shown the contract with Alley and the trustees; and not until June 1884, did he become aware that an absolute conveyance had been made of the property, not to a corporation, but directly to Alley.
He also testified, that at the time last named Cooper showed him a notice from Alley and Sperry to the trustees, *250 and also a copy of the contract made with Alley under which he agreed to advance money to the trustees to complete the payment for the option. This agreement, bearing date the, 2d day of May, 1883, is between John B. Alley, of the first part, and Samuel C. Pomeroy, Glen W. Cooper, and R. W. Clapp, of the second part, and recites that the parties of the second part, on the 7th day of April, 1883, entered into a contract or agreement with Dudley and Dean, whereby the latter obligated themselves to sell to Pomeroy, Cooper and Clapp, all the property, real and personal, together with all franchises lately belonging to the Pennsylvania and Sodus Bay Railroad Company, for the sum of thirty-five thousand dollars, in addition to five thousand dollars previously paid, and declares that “in consideration of the transfer and assignment this day made by the parties of the second part of the said contract, to said party of the first part, he, the said party of the first part, agrees to pay said Dudley and Dean, upon being satisfied that they have good and sufficient title to said aforementioned property, and upon their conveying said property to said party of the first part, by good and sufficient and unincumbered title, twenty-five thousand dollars. And said party of the first part further agrees, that after being paid from the proceeds of said property said sum of twenty-five thousand dollars, with interest at six per cent, per annum, he will next pay to said parties of the second part, so much as may be further realized from the disposition of said property, not exceeding the sum of fifteen thousand dollars, with interest. And it is still further agreed that after realizing the aforesaid sum of forty thousand dollars, with interest, the further proceeds of said property shall be divided equally between said parties of the first and second part, one moiety to the party of the first part and one moiety to the party of( the second part. Given under our hands and seals the day and year above written.
John B. Alley, [seal]
Witness: Saml. C. Pomeroy, [seal]
John C. Rice. Glen W. Cooper, [seal]
R. M. Clapp. [seal]”
*251 By a paper dated May 9, 1883, one Sperry was admitted to take a one-half interest with Alley, subject to the condition that he would pay one-half of the $25,000, and Alley the other half. Indorsed on that paper is the following: “We assent and concur in the arrangement between Messrs. Alley and Sperry,” which was signed by Pomeroy and Clapp. The other paper was a notice addressed to Pomeroy, Cooper -and Clapp, and signed by Alley and Sperry, dated June 20, 1884, giving them notice they desire a return of the money they have advanced, and will sell to the three persons named, at any time within twenty (20) days from the date thereof, all said property and franchise, upon the payment of the money so advanced, with' six per cent, interest; and if they shall fail to take and pay for the same within said time, ■ that Alley and Sperry will proceed to sell it to any other person for the best attainable price.
Cooper also brought with him another paper, which he wanted Payne to sign, notifying Alley that Mr. Payne had put $5,000 into the scheme, and had a claim to that extent. Payne declined to sign the notice, stating that he had nothing to do with Sperry and Alley. He says he then for the first time became aware that Alley’s contract was not made with the contributors to the fund at all, as the original contract was, but with Pomeroy, Cooper and Clapp, who alone were to get the $15,000, if anybody should get it. He declined to sign the paper, or to have any communication with Alley, in any form, and Cooper left.
Afterwards, July 7, 1884, Cooper wrote to Payne, stating that he had thought it best to again notify Alley and Sperry of his, Payne’s, interest, by calling their attention to the provision for a refund of $5,000 and interest to Payne in the original contract prepared by Mr. Rice, to be signed by Alley, “and which provisions Mr. Alley omitted when he re-wrote the contract, as I told you at the time. I told Mr. Alley that he thus had notice of your interest before he signed the contract.”
Payne says that immediately upon receiving this letter, *252 he wrote a reply in which he told Cooper he was mistaken in his statement that he had told him at the time that Alley had omitted his, Payne’s name, when he re-wrote the contract, and said: “You did not tell me of the omission until many months after the transaction. You then suggested that Mr. Alley ought to know that I had put up money for the purchase. I have no claim on Mr. Alley, as you know. I look to you and Mr. Pomeroy for my money.”
Payne says Cooper never succeeded in getting any orife to take his place; that there was some more conversation or intercourse between the parties, but the result of it all was that Payne brought this suit in 1885.
It appeared also that the money which was paid by Payne to the trustees was applied to the purpose of securing the option before there was any certainty on their part that Alley or any one else would make the payment of $25,000, and therefore, there was a liability of its being entirely lost, because Alley might not have entered into it, and the entire scheme might have fallen through.
We have quoted thus fully from the documents and testimony of Payne, as the simplest mode of presenting the contentions of the plaintiff. The defendant’s position may be stated more briefly.
The witnesses on the part of the defence are Mr. Cooper and Mr. Pomeroy. Cooper contradicts Payne as to almost every statement involving the contested points of the case. He declares that after Alley’s advance of the money, he told Payne in the first conversation, of the conveyance to Alley and gave him full information of everything that had occurred; that he also told him the company had been organized and a board of directors was to be appointed soon, and consulted him as to whether or not he would agree to serve in that capacity; that he consulted Payne, as he would have done any other person interested in the enterprise, stating to him that the laws of New York required that at the organization the directors must be citizens of the State, but that the figure-heads could pass out, and Payne could *253 then be elected; that every attendance at a director’s meeting would cost $25; that Payne declined the position; that Payne was in error in stating that when the assessments were made he, Cooper, was in any financial difficulty, which would have prevented him from advancing the money; that he understood when Payne drew the checks to the treasurer of the company he was paying assessments on his own account, as any person having stock in the company, and considering himself a member of it, would have done.
Mr. Pomeroy is examined upon the single point that he had given Payne information of the conveyance to Alley shortly after it was made. He stated he met Payne in front of the Ebbitt House soon after the negotiations were concluded in June 1883 (and, of course, before the date, June 1884, at which' Payne says he first heard the particulars of the contract with Alley and the conveyance to him), and then spoke to him of the fact that Sperry had taken one-half of the Alley interest and had paid one-half of the $25,000, and that Alley and Sperry had received at that time a conveyance. Pomeroy reiterated several times in his testimony that he certainly talked with Payne at the time indicated about this conveyance — all of which Payne in rebuttal denied.
The case went to the jury on this conflict of evidence, and a verdict was given for the plaintiff. It comes here upon a case stated, as well as upon a number of exceptions to the rulings and charge of the court.
The first exception is to an instruction given by the court below at the request of the plaintiff, in these words:
“ If the jury find from the evidence that the plaintiff entrusted to the defendants the money sought to be recovered from them in this action for the purpose of being employed in the purchase of the property of the Pennsylvania and Sodus Bay Railroad Company in accordance with the plan and in pursuance of the objects set forth in the agreements between the defendants and Sears, Crowley and Clapp, which have been introduced into evidence, and that the de *254 fendants, without the authority or consent of the plaintiff, used the said money in making a purchase thereof, upon the terms and under the stipulations disclosed by the agreement between themselves and John B. Alley, their verdict must be for the plaintiff, unless they further find that the plaintiff, after having been fully and fairly apprised of the material particulars in which the defendants had departed from their authority in making the said purchase, ratified or consented to their said action; and upon the question of ratification the burden of proof is upon the defendants.”
Counsel for the defendants insist the instruction was erroneous: first, because the arrangement with Alley, which is said to' be inconsistent with the original contract stated in the receipt, is not a matter of importance in this case, since it does not undertake to exclude Payne, and could not therefore injure any rights previously acquired by him, and that Payne would still get the $5,000, or one-third of the $15,000 despite the Alley contract.
But the contract with' Alley is explicit that the $15,000 is to go to Pomeroy, Cooper and Clapp, and Payne is not mentioned in it at all.
Next it was insisted it was unimportant whether Alley and Sperry organized the company, or whether the trustees did so, and hence any incompatibility between the two agreements in that respect is of no consequence.
But there remained no guarantee, after the trustees had parted with their title to Alley, that Alley would make any organization. He was not required to do so by the contract, and as the trustees had abandoned their duty and abdicated their power in this respect, there could be no assurance it would be done.
Next, it was contended that, as Payne was only to get his five thousand dollars out of the bonds and stock, to be issued by a company, and as a company had been since organized, the bonds and stock could still be issued, and he could still get his $5,000 from that source.
But again the reply is, there remained no guaranty that *255 the incorporation, so organized, would ever issue any bonds for the purpose indicated. By the Alley contract, Alley was to be paid his $25,000 in advance of all others. But it is said, Alley could not enforce this provision because the Alley agreement could not interfere with the legal operation of the railroad law upon this organization thus made, which would not recognize such a preference. This is, in effect, an attempt by the trustees to defend themselves for their breach of duty, by saying the agreement they made with Alley, being one he might not be able to enforce, was but a clumsy breach of trust and therefore their conduct was venial; and that the chance of Payne’s being finally reinstated in his rights by a suit at law, is the equivalent of the preservation of his original rights, unimpaired.
The plaintiff was not obliged to wait to ascertain whether his rights might ultimately be secured to him. As soon as the defendants had disenabled themselves from performing their obligation, his right of action accrued.
This principle is recognized in actions for breach of promise of marriage, where the defendant has married another person, and thereby incapacitated himself from complying with his contract to the plaintiff. No request to marry need be shown under such circumstances, and it is improper to allege it. 2 Saunders Pleadings and Evidence, 346; Chitty on Contracts, 538. In 15 M. & W., 189, Cairnes vs. Smith, which was an action of that description, the court illustrates the propriety of its application thus: “If a man, being under contract to deliver certain goods to another, should put it out of his power to do so by destroying them, it cannot be necessary to request him to do so.” 8 Adolphus & Ellis, N. S., 358. In 23 Pickering, 455, Heard vs. Bowers, the court said: “The general doctrine undoubtedly is, where a party stipulated to make, a conveyance of an estate to another at a future day and before the day conveyed the estate to a third person, he is to be considered as guilty of a breach of his stipulation, and is liable to be sued before the day arrives. So although he should re-purchase the same *256 estate before the day appointed for the performance of his contract, he would still be liable for a constructive breach of his contract, and he could not compel the other party to perform it on his part.
“ In 6 Barnwell and Creswell, 327, it appeared that A. stipulated that he would, as soon as he became possessed of a public house, execute a lease thereof to B., from a designated date, for a specific term of years. At the time of making the agreement, the house was under lease, which would not expire until after the date named, and the legal estate was in trustees, who were to hold it for the use of A., after he attained twenty-four. At the designated date, and after A. had attained twenty-four, but before the outstanding lease had expired, he and the trustees joined in a lease to C. for a long term. Held, that A., having thereby put it out of his power, so long as the latter lease subsisted, to grant any lease to B., had committed a breach of that agreement, although the first lease had not expired.”
We think the instruction was correct and properly guarded.
The first prayer of the defendants was:
“ If the jury find from the evidence that after the organization of the company referred to in the receipt which has been given in evidence, and after the plaintiff had information of the contract with Alley and Sperry, and of the conveyance to them, and if you further find that said assessments were made by the company against the parties in interest, the plaintiff included, and that the plaintiff paid such assessments, then he must be deemed to have waived any and all objections to the transfer to Alley and Sperry and you should find for the defendants.”
The justice below, in our opinion, very properly amended the prayer by striking out the words “then he must be deemed to have waived any and all objections to the transfer to Alley and Sperry, and you should find for the defendants,” and substituting therefor the words “then such payments may be considered as evidence tending to show that *257 the plaintiff waived any and all objections to the transfer to Alley and Sperry, but must be considered in connection with all the other testimony on this subject.”
The prayer as presented was faulty, because it instructed the jury that the bare fact of the payment of the assessments would operate as a waiver of alb objection to the transfer to Alley; excluding from their consideration, all the evidence as to Payne’s reasops for making the payments and the terms upon which they were made; which exclusion would have had a direct tendency to mislead the jury.
The defendants insist fhis modification left to the jury the determination of the legal effect of the evidence as to the alleged waiver.
But the instruction, as presented, was obnoxious to the same objection. In its original'form it proposed to tell the jury if they found the payment of the assessments, that bare fact, in law, absolutely established a waiver. As modified, it told them, if they found the payment, the finding of that fact would, in law, tend to prove a waiver, but must be considered with all the other testimony on the subject. There was no more submission of the legal effect of the evidence in the one case than in the other. The effect of the change was, that the court by the amendment attached the proper probative value to the fact, instead of defining that probative value incorrectly, as was proposed by the instruction originally.
The second prayer of the defendant was:
“ If the jury find from the evidence that the plaintiff had knowledge of the conveyance to Alley and Sperry before the organization of the new company, and made no objection to the conveyance to Alley and Sperry, and did not signify any objection to such organization, he must be deemed to have waived any objection to the arrangement made with Alley and Sperry, and they should find for the defendants.”
This was so amended by the court as to require the jury to find that if the plaintiff, after knowledge of the conveyance to Alley and Sperry, before the organization, “ acquiesced in the same, and having knowledge of the proposed *258 organization, did not signify any objection thereto,” before the plaintiff could be deemed to have waived any objection to the arrangement made with Alley and Sperry. The all-important requirement that the jury should find the plaintiff had knowledge of the proposed organization was entirely left out of the original prayer. The court properly declared such knowledge should appear before he would be affected by it. But as his right of action was complete as soon as the trustees had abandoned and abdicated their duties and powers, and thus disenabled themselves 'from complying with the conditions upon which alone Payne entrusted his money to their charge, the instruction was unimportant.
The third prayer of the defendant is:
“The jury is instructed that the organization of the company, as evidenced by the articles of incorporation, operated as a transfer of the property to the new organization and was a compliance with the duties of the defendants as trustees, and under the terms of the .receipt in evidence the plaintiff must look to the provisions made therein for reimbursement, and you should find a verdict for the defendants.”
This prayer was properly rejected: first, because the incorporation could not operate to blot out all paramount liens against the property existing before the incorporation for the payment of the purchase money; and second, because the trustees having expressly agreed to hold the title of the property until the organization of the new company, and then convey it to that corporation, after the preference claims of all the contributors had been, discharged pro rata as expressed in their agreement, could not be absolved of their obligations by the filing of the certificate of incorporation. When the trustees parted with their power to perform their contract with the plaintiff, their liability was fixed, and the subsequent conduct of those in whose favor they had abandoned their trust could not absolve them from the consequences of their breach of duty.
The fourth prayer of the defendants is:
“ Outside of specific evidence of notice by the defendants to plaintiff of the conveyance of the property to Alley and *259 Sperry, and by them to a railroad company, the filing of the articles of incorporation by them reciting the ownership of the property, was notice to the world and to the plaintiff that tire title which had been and was in them was thereby vested in the new railroad corporation.”
It is impossible the bare filing of the articles of association of the New York Northern Railway Company in the office of the Secretary of State in Albany could be “notice to the world and to the plaintiff ” that the title that had been in Alley and Sperry was thereby vested in the new railroad company. No authority was shown in support of this proposition.
Besides, as the right of action had accrued as soon as the trustees had, in violation of their duty, conveyed the property to Alley and Sperry, the alleged organization became immaterial to his rights to recover.
The fifth is:
“ If you find that by the agreement the defendants were to cause the property to be conveyed to a railroad corporation thereafter to be organized, when the stocks and bonds were to be pledged in a suitable manner for the return of the purchase money, and you find that it was so conveyed and that no stocks or bonds have been issued by it, then the defendants are not liable in this action.”
This prayer left the jury to find that the property was in fact conveyed in the manner contemplated by the agreement under which the defendants were trustees, though there is no denial that the reverse is the fact in many particulars. It assumes that the New York Northern Railway Company named in Alley’s incorporation is the same with the Pennsylvania, Lake Ontario & Northern Railway Company named in the receipt to Payne, of which there is no proof; and that the purchase money under the Alley contract was to 'be returned to the subscribers in the same manner as was. provided in the agreement with defendants, which is the reverse of the fact. It assumes that the alleged incorporation provided for the issue of bonds and stock for the purposes of the agreement with the plaintiff and the con *260 tributors generally, although the incorporation contains no such provision. Finally, it assumed that the liability of defendants to plaintiff, already fixed by their conveyance to Alley and Sperry, could be annulled by the subsequent act of incorporation.
It does not appear how far it may be important, but the fact is, that in the receipt given by the trustees to Payne it was stipulated that the organization to be made was to be called the Pennsylvania, Lake Ontario & Northern Railway Company, and that in the record there appears the route of the original railroad, which began at a place called Spencer, in Tioga county, one of the southern range of counties of New York, and'running thence to a point on Lake Ontario. Under Alley’s incorporation, as it may be called, the starting-point is at a place called Waverly, on or near to the Pennsylvania line, and the route seems to be different. But it is enough to say that it is not shown here that the two routes are identical and substantially the same.
These constitute the prayers offered in behalf of the defendants, and we think each was properly rejected as offered.
The next exceptions are to various parts of the charge, indicated by being placed in brackets.
First, it is contended the court repeatedly assumed the province of the jury by pointing out the particulars in which the transfer to Alley and Sperry operated as a departure from the contract with Payne. Undoubtedly the presiding justice did assume, in the instances pointed out, to make such statements; but we do not doubt his action in this respect was entirely proper. He was comparing and contrasting written documents, and it was his right and duty to state to the jury their meaning and effect upon each other. .
The general principle justifying such action is elementary, 1 Greenleaf Evidence, Secs. 49, note 3; 177, note E; 1 Taylor Evidence, Sec. 36.
Where the writings contain peculiar words of art, or phrases used in commerce or trade, the determination of the meaning of such words or phrases should be left to the *261 jury; but subject to this ascertainment by the jury it is for the court to decide the meaning of the instruments. Thus it is the function of the judge, upon a comparison of two sets of specifications annexed to competing claims to patents to decide whether either is void for want of novelty. The necessity of such a rule must be recognized when it is considered how little adapted twelve men in the jury box, inexperienced in scanning papers, and some of whom may not be able to read them, would be to decide whether or not one writing, by its legal effect, countervails or is repugnant to others; while its justice is apparent when it is remembered that if the inquiry were left to the jury, there could be no appeal from their misjudgment; while an error in this respect by the court can be reviewed on appeal.
This exception was addressed rather to the authority of the justice to state to the? jury the points of repugnancy between the writings than to the correctness of h'is criticism. We have compared the instruments to see whether hife interpretation of their scope and meaning, in the particulars pointed out in his charge was correct, and we have no hesitation in saying that it was. It is not necessary to go through what he said to, show this, though the demonstration would be easy.
The remaining question of importance is as to this remark in the charge:
“ Of course, when a man pays his money to another person to be applied to certain purposes, and it is applied to another purpose, the plain common sense and the law of the matter is, that he has a right to reclaim h'is money; and on this snowing, if nothing else appeared in the case, Col. Payne’s right to recover would be very plain.”
The defendant’s counsel says this must have been intended to inform the jury, by the words “if nothing else appeared in the case,” that notwithstanding all the other evidence, if they believed Payne had paid his money for one purpose, and the defendants had applied it to another, Payne was entitled to recover.
*262 But such is not the correct significance of the language. As we conceive, those words plainly mean “unless something else appears in the evidence to combat the proof of the misapplication of money.” That seems to be the only fair and sensible construction of the words, and that ascribed to them is a perversion of their meaning. There are few sentences which when read with certain emphasis and pauses may not present a meaning quite different from that intended; but this expression is not readily susceptible of such a change of meaning.
The court had plainly informed the jury it was essential to Payne’s recovery, that it should appear there had been no waiver or acquiescence on his part of the important departures in the Alley contract from the provisions of the previous contracts under which Payne had become a subscriber. The justice immediately says it is insisted something else does appear in the case, which, if true, would destroy Payne’s right of recovery; and he takes up seriatim the contentions and evidence of the defendants and places in opposition the testimony of the plaintiff, and leaves to the jury the determination as to which of them they should give credit. It'would be most unjust to say, even if there were any obscurity about this particular sentence, that he should, by that sentence, be understood to have annulled the greater part of what he said in his charge.
We are asked on consideration of the case stated to reverse upon the ground that the verdict is against the evidence. It is unnecessary in this case to invoke the rigorous rule we have laid down as to the degree of force in the evidence which we would require to cause us to reverse a verdict given by a jury and approved by the justice who heard the testimony. We think the jury were quite justified to render the verdict they did, by the evidence in the record. .The court told them distinctly there was a conflict of evidence, and it was their duty to decide between the witnesses. As they saw fit to decide in favor of the plaintiff, we have no fault to find with their verdict.

The judgment is affirmed.